## SUGARMAN *v.* SUGARMAN

[No. 81, October term, 1950.]

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Jacob D. Hornstein* with whom was *E. Milton Altfeld,* on the brief, for appellant.

No brief and no appearance for appellee.

GRASON, J., delivered the opinion of the Court.

By decree of the Circuit Court of Baltimore City, dated January 30, 1950, Leon Sugarman was required to pay the sum of $25 per week to his wife, Ruth B. Sugarman, as alimony. On February 24, 1950, the husband filed a petition in the case wherein he prayed the "Court to pass an Order, granting unto your Petitioner the privilege of adducing further testimony in said cause for the presentation of such evidence as may be pertinent to said cause"; the wife filed a combination demurrer and answer; the demurrer was overruled; the parties,

through their counsel, stipulated: (1) that the husband abandon any claim to rehearing on the facts adduced at the hearing on January 30, 1950, leaving open the question of the amount of permanent alimony as may now be proper, if any; (2) the husband admitted that he was at that time employed by the firm of Middleman and Wise, as shipping clerk, at a gross pay of $40 per week, or take-home pay of $37.20 per week; (3) that written memoranda be filed with the Court in support of and in opposition to the pending petition and that no testimony need be taken in open court at that time in connection therewith.

On June 8, 1950, the chancellor passed an order reducing the alimony from $25 per week to $10 per week. From this order the wife appealed.

The appellant filed in the Circuit Court of Baltimore City, a bill against her husband, wherein she prayed to be divorced *a mensa et thoro*, alimony *pendente lite* and permanent, and suit money. She thereafter dropped the prayer for a partial divorce and amended her bill and prayed for alimony *pendente lite* and permanent, and suit money; which amended bill was answered and the case went to trial, resulting in the decree of January 30, 1950. There was no testimony offered at the hearing on the petition for a rehearing, the court and the parties to this case relying entirely on the testimony on which the first decree was based. That testimony discloses the following facts: These parties were married February 22, 1948, at Yuma, Arizona, and were married a second time by a religious ceremony on March 20, 1948, in Los Angeles, California. Neither was married before. She was thirty-six years of age at the time she testified and said her husband was forty-one years of age at that time. When they were married the husband was in the used car business with his brother, doing business under the name of Suggie Motor Company, located in Hollywood, California. Just before the marriage she worked at the Santa Anita Race Track, as a cashier, and before that she worked for Earl Carroll, in Los Angeles, as a

cashier in a restaurant, and she started work "when I got out of school" and worked continuously until the time she was married. There were no children born to these parties. About a month after she was married she filed for unemployment insurance. "I received $22.00 a week for twenty weeks, which went into the joint account that we had, checking account from which I paid all bills".

The used car business in California collapsed. The accountant who made up the amended income tax return for the company for the year 1948, was indicted and went to jail. The wife said that on June 2, 1948 (this is a mistake, it was June 2, 1949) these parties left California and drove to Brooklyn, New York, to see the wife's sick mother, who was then dying with cancer. Her mother and father lived at that place. The mother died on July 26, 1949. The appellant and her husband stayed at the home of her sister, in Brooklyn, until the separation. The appellee was born and raised in Baltimore, where his people live. His mother was ill, and before the death of the wife's mother he came to Baltimore to see his mother, returning to Brooklyn to attend the funeral of his mother-in-law. After the funeral he returned to Baltimore, and thereafter never lived with his wife.

It appears that before leaving California the appellant sent from Los Angeles $1,500 to the East Brooklyn Savings Bank, with instructions to deposit same to the joint account of herself and her husband. She says she had this money "in joint account in Los Angeles, and when we were—my husband got in serious trouble along with his accountant, and there was two months of court litigation over the business and the books and a lot of other things". The husband notified the bank in Brooklyn not to honor the appellant's check. She had an automobile titled in her name, which was given to her by her husband, and in which they drove from California to Brooklyn, New York. Her husband drove it to Baltimore when he deserted her and she came to Baltimore

and got the car and now has it in Brooklyn. She sold the car for $1,200, but cannot consummate the sale because the car is titled in California, and under the California law the husband must join with her in assigning the title to the purchaser, which he will not do.

The wife says the husband has about $11,000 which came from the business in California. He says he got nothing from the business, but had $10,000 which was accumulated over a period of about fifteen or twenty years. He sent that sum to Baltimore and it is now deposited in a safe deposit box in a bank in Baltimore, in the name of one of his sisters. The wife says she is destitute and is now living with her father, in Brooklyn; that she was so shocked at the way her husband behaved prior to and after the death of her mother that she is a nervous wreck, has to take sleeping pills, and is entirely unable to work. At the time of their marriage, she says, she was allowed $75. a week. "We opened a charge account after we were married—he opened it." She bought her husband what she terms "a trousseau" and charged the same. She said his clothes were very bad.

The husband testified: "Q. You are letting the $10,-000.00 which you swore to you have stay idle? A. That is right. Q. Why? A. Because I don't think I am capable of going into business with it and I have had that money ever since I was a kid." He said he has high blood pressure and that he went to a doctor in California and "to the Veterans' Administration also here". He testified he never gave the car to his wife.

"The Court: Was it in her name?

"The Witness: Yes, at the instigation of her friend, the accountant, who said—Put it in her name.

"Mr. Bregel: Is that the one that went to jail?

"The Witness: Yes.

"The Court: This $1,500.00 in a New York savings bank, where did that money come from?

"The Witness: From my brother and I in the business.

We put that in my name and my wife's name to pacify her because she was always antagonistic towards my brother.

"The Court: You mean that was a gift then from you and your brother?

"The Witness: A gift not to her, but to me. We were to buy furniture with it—taken from the business out there."

The appellee lives with his mother at 2450 Callow Avenue, Baltimore. He works as an installation helper for W. E. Sellers Company. They are engaged in the manufacture of draperies, slipcovers, Venetian blinds, and awnings during the season, and he makes "$34.00— eighty five cents an hour for a forty hour week" and that is the least he has earned in a good many years. He nets "about $31.00 a week", out of which he pays his mother $10.00 a week for board, and $10.00 a week alimony to his wife. The appellant claims that he was offered a position as a traveling salesman for a tobacco concern. He had to be experienced in selling tobacco and candy. An employee of the tobacco concern wrote him a letter about this, to which he did not reply. He said he was not an experienced tobacco and candy salesman and that the firm would soon find it out if he was not able to fill the position.

Formerly his parents owned a property known as 1315 Hillen Street (which is also referred to in the record as Hollins Street) which vested in his mother upon the death of his father. It was heavily mortgaged and subject to a ground rent. He paid off the ground rent and mortgage, and the property was deeded by his mother to him. This property was deeded by him to his mother in June, 1949. The income from the property, since his father's death, has been used "to pay the rent on the apartment on Callow Avenue and her (his mother's) living expenses". Appellee testified the property at Hillen (or Hollins) Street was not worth anything until the mortgage and ground rent were paid, and after he paid the same, under an agreement with his brothers the property was put in his name so that in the event

anything happened to his mother it would not have to go through the courts.

It has been stated repeatedly by this court that: "In determining the award of alimony, the court should consider the maintenance of the wife in accordance with the husband's duty to support her suitably. In addition to the financial circumstances of the parties, the court usually considers their station in life, their age and physical condition, their ability to work, the length of time they lived together, the circumstances leading up to the separation, the fault which destroyed the home, and their respective responsibilities for the care and support of the children." *Dougherty v. Dougherty,* 187 Md. 21, 33, 48 A. 2d 451, 457; *Timanus v. Timanus,* 178 Md. 640, 642, 16 A. 2d 918.

While this is so, the court must base the allowance for alimony on the financial condition of the husband at the time of the decree. If he has no income at that time, no allowance can be made. What his financial condition might be in the future cannot be considered, because that would be speculative. His conduct leading up to the divorce may be considered, but he cannot be penalized or punished by the amount of alimony awarded, for "alimony is never a punitive measure". *Waters v. Waters,* 191 Md. 436, 440, 62 A. 2d 250, 252. Alimony is variable. If the condition of the parties changes, the chancellor may modify the decree in accordance with present conditions, as his jurisdiction is continuing. "The doctrine is founded in an equality of right and obligation, and its enforcement is indifferent to whether the change is in the relief of one spouse, so long as the rights of the other are not denied. It is patent that of its nature alimony is in amount subject to variations from time to time as the circumstances, needs, and pecuniary condition of the parties change." *Winkel v. Winkel,* 178 Md. 489, 499, 15 A. 2d 914, 918.

It is further said in the case last quoted: "The obligation must be correspondingly fulfilled out of the husband's contemporaneous faculties, whether in wealth, in moderate means, or in poverty. Within this gamut

of fortune the wife shares. From the nature of affairs, change in tangible property and in income and in earnings may occur as well after as before the separation of the spouses. * * * 'So that the law of this state now is that where alimony is allowed in a decree awarding a divorce *a mensa* or *a vinculo*, or in a decree awarding alimony alone, the jurisdiction of the court as to alimony is continuing whether reserved or not, and so much of the decree as relates to the allowance of alimony may be from time to time changed, and the allowance increased or decreased or otherwise modified so as to conform to changed conditions.' " See *Knabe v. Knabe*, 176 Md. 606, 616, 6 A. 2d 366, 124 A. L. R. 1317.

In this case the chancellor had a perfect right to reconsider alimony allowed to appellant in his order of January 30, 1950, and his order of June 8, 1950, reducing the alimony from $25 to $10 per week will not be disturbed, unless clearly wrong. If he made a mistake in the former decree, it was his duty to correct his mistake.

The wife was thirty-six and the husband forty-one at the time of the taking of testimony in this case. They have no children. The wife worked all her adult life until the marriage. There is no evidence that she was delicate or sick until after her husband abandoned her. She now says that she was so shocked by his abandonment that she cannot sleep and has to take sleeping pills, and is unable to engage in any gainful pursuit. They had been married about a year and five months when the separation occurred. The husband served in World War II. After his discharge he worked. What work he did is not shown by the evidence, except we do know that at the time of his marriage he was engaged in the used car business in California with his brother. Evidently he made a good living at that business, for his amended income tax return for 1948 shows that he made $7,096.02. But there was something queer about that business, for the man who stated the income tax return, according to the appellee, was sent to jail. The wife stated that they were in trouble about that business

for a long time, and there is no doubt that the business collapsed. Certainly the earnings of the appellee in the used car business in the year 1948 cannot be considered in this case as an element for the allowance of alimony. That business is past and gone, and with it the income that he received from it.

We do know that at present the appellee is employed, and what his earnings are. Excepting his present employment and his venture in the used car business in California, we do not know what his employment was, but he says that he never earned as little as he does now in his life. The evidence indicates that his people in Baltimore are well-to-do, and the appellant thinks that they could give him a good position. A friend wanted him to take a position as an experienced tobacco and candy salesman, at $60 a week and commissions, but he would not do this because he was not an experienced tobacco and candy salesman, but whether or not he could have obtained this position and held it if he had gotten it, is highly speculative and cannot be considered in the allowance of alimony.

He has $10,000. His wife says it is $11,000 and that it is from the used car business in California. It is contended that he should invest it and make money with it in order to pay his wife alimony. He says he is not a business man and doesn't know anything about business and he does not desire to invest the money. Of course if he did invest it the question of whether or not it would be lost in the venture, or he would make a fortune, is again highly speculative. The interest it would earn these days, if deposited in a savings bank, would not be very much.

The appellant contends that the harsh and cruel way appellee abandoned and deserted her should be considered in awarding alimony. In a proper case such treatment might be considered, but in a case like the one before us, where the husband is making $40 a week, to take in consideration his harsh or cruel manner attending the separation would be punitive, and in allowing the amount of alimony, punishment cannot be imposed. In the matter

of the Hillen (or Hollins) Street house—this house belonged to appellee's mother. It was, so far as the evidence discloses, the only source of her support. It was mortgaged and subject to a ground rent. The mortgage and ground rent the appellee paid off and to secure him, and under an agreement with his brothers, the mother deeded him the property in 1935. She received an income of $900.00 from this property, which supported her. What the amount of the mortgage was, or what it cost to redeem the ground rent is not shown by the evidence, and it would seem that the sons viewed the mother as a life tenant of the property and that the appellee had a lien on the same for the money he invested in it.

The appellee makes $40.00 a week (net about $37.20), pays his mother $10 a week board, his wife $10 a week alimony, leaving a balance of $17 a week for his personal needs.

The wife said that the automobile in which they drove from California to Brooklyn, New York, was given to her by her husband, but she does not say that it was titled in her name. She testified that she has the car but her husband has the title to it and she, therefore, cannot assign the title to the purchaser. There seems to be another case pending between these parties, which deals with their property rights. It is referred to in the testimony. It was said by counsel for appellee, in the trial of the case below, in answer to a question by the chancellor, that the bank account would be reserved for the other, or property rights case. We suppose that these two items have been since disposed of in the property rights case.

We have carefully considered the testimony and we cannot say that the chancellor who saw the witnesses and observed them while testifying, was clearly wrong in reducing the alimony from $25 a week to $10 a week.

*Decree affirmed, costs to be paid by appellee.*